UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CLEVELAND HICKMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:06CV690 RWS |
| | ) |
| PRESIDENT CASINO, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**<u>MEMORANDUM AND ORDER</u>**

Hickmon worked for the President Casino when he was promoted to be its Director of Security, a position that required him to obtain an Occupational License, Level One from the Missouri Gaming Commission. The Missouri State Highway Patrol's Gaming Division conducts the required background investigation of all Level One applicants, including Hickmon. Hickmon was provided with a temporary license so that he could perform his job duties, but he was fired by the President Casino before his application process was completed.

In this lawsuit, Hickmon complains about events surrounding the investigation of his Level One application and his subsequent termination by President Casino. Hickmon alleges that he was harassed and treated unfairly because he is African-American. Hickmon's amended complaint asserts claims for due process violations (Count I), false arrest (Count II), conspiracy to commit a

civil rights deprivation (Count III), neglect to prevent a civil rights conspiracy (Count IV), and malicious prosecution (Count V). Named as defendants are: the Missouri Gaming Commissioners in their individual capacities[1]; St. Charles County, the St. Charles County Sheriff's Department, and two John Doe police officers with St. Charles County (St. Charles County defendants); and Sergeant Steve Akridge of the Highway Patrol's Gaming Division.[2]

All defendants have moved for summary judgment, and the motions have been fully briefed. Because Hickmon has come forward with no evidence to demonstrate any genuine issues of material fact that would preclude summary judgment, defendants' motions will be granted, My analysis follows.

**Standards Governing Summary Judgment**

In considering a motion for summary judgment, the Court must "view all of the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." Rech v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993).

---

[1]Defendants Floyd Bartch, Judith Sutter-Hinrichs, Ralph Biele, Darryl T. Jones, and Noel J. Shull served as Missouri Gaming Commissioners during the relevant time period.

[2]President Casino was originally named as a defendant but was later dismissed with prejudice by Hickmon.

"Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. "Although the moving party has the burden of demonstrating the absence of genuine issues of material fact, the 'nonmoving party may not rest upon mere denials of allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003) (quoting Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1107 (8th Cir. 1998)).

## Undisputed Facts

Hickmon worked for the President Casino as Director of Security for roughly two years from 2002 to 2004. His duties included supervising all security personnel on the facility, enforcing internal controls and ensuring that employees and customers complied with all Missouri Gaming Commission regulations . Hickmon applied to the Missouri Gaming Commission for a Level One Occupational license, which is required for all casino security manager positions. The Level One licensing process is extensive (the application is more than 60 pages long) and calls for detailed work history, criminal history, financial data, and tax information. The application signed by Hickmon contains the following statement:

**WARNING**

> Each question must be answered fully, accurately, and completely. Any misrepresentation or omission can result in application denial. When information is unknown, so indicate. You must make a substantial inquiry to determine the answers to all questions. Any statement that is not true or not disclosed, which becomes known at any later date, is cause for revocation of the Riverboat Gaming License.

The Gaming Commission may refuse an occupational license to any person or revoke or suspend an occupational license of any person who has been convicted of a crime or who provides the commission or its agents with false or misleading information, documents, or data or who makes false or misleading statements to it or its agents. Hickmon knew that he had to truthfully and completely supply all the information that was asked for in the application or his application could be denied.

The Missouri State Highway Patrol's Gaming Division provides law enforcement services on gaming boats and performs background investigations of license applicants for the Gaming Commission. Sergeant Akridge of the Highway Patrol's Gaming Division conducted Hickmon's Level One background investigation, which includes all aspects of an applicant's professional, financial and personal history, including examination of records and interviews with family,

employers, co-workers, and friends. Corporal Jim Bennett assisted him. Applicants are routinely asked to submit detailed personal and financial records; for example, records relating to their bank accounts, real and personal property, state and federal taxes, marriages, divorces, and children, including providing documentation in the form of official government documents and court documents.

In response to the question about whether he had ever been arrested, detained, charged, convicted, or pleaded guilty to any crime, felony or misdemeanor (excluding traffic violations), Hickmon answered that he had been arrested in 1991 in Joliet, Illinois, for assault, and that the case had been thrown out of court. This answer was not true, because he was in fact convicted of battery, sentenced to four days in jail and one year of probation and fined $100. Hickmon was also arrested on February 11, 1989, in the state of California by the Oceanside Police Department. Although Hickmon states that the arrest was a case of mistaken identity (which is not disputed by defendants), he does not deny that he failed to disclose this fact.

Hickmon also failed to provide all required information about his financial condition, including a judgment against him, numerous overdraft charges on his bank account, and multiple accounts that had been turned over for collection. In

his application, Hickmon stated his salary was over $59,000 a year, and that he had resided at 2308 Mariposa, O'Fallon, Missouri, from May of 2002 until he moved to 12 Shepard Knoll Court in St. Peters, Missouri on July 29, 2003. Hickmon contends that the investigation into his financial condition was racially motivated because Akridge recorded the vehicle identification number for his luxury vehicle (which he paid for in cash) and then questioned him about how he could afford it and other items. Hickmon also claims that he was racially harassed because he was asked if he purchased the vehicle with proceeds from drug sales. Hickmon claims he "felt defensive" about the questions being asked by Akridge.

Hickmon was divorced and did not provide the requested information about his ex-wife (including her current residence) and her child. He claims he did not provide this information because he did not have it. Hickmon contends that the requests for this information were racially motivated, and to support this assertion he claims that Akridge (who is white) once said that "you people" have "kids running around here all the time." Hickmon also claims that Akridge racially harassed him by asking him to provide documentation proving that he was not the father of his ex-wife's child and told him that he should hire a private investigator to track her down. Hickmon believes that requests for this and other information that he was "unable to provide" amounted to racial harassment.

On December 8, 2003, Akridge interviewed Hickmon and asked him where he lived. Hickmon said that he lived at #12 Shepard Knoll Court in St. Peters, Missouri and paid $875.00 a month rent. However, none of Hickmon's financial records showed rental payments, so Akridge asked Hickmon for the name of his landlord. Hickmon responded that he did not know the name of his landlord but would send it to him. Akridge also questioned him about the information in his application, including his arrests, but Hickmon did not reveal the true nature of his Illinois conviction or his California arrest. He also failed to mention the judgment against him and his other financial issues. When Akridge asked Hickmon again to provide the information missing from his application (including the name of his landlord), Hickmon complained to President Casino General Manager Chris Strobbe. Strobbe told Hickmon he needed to cooperate with them and provide whatever information or documentation they requested. Strobbe testified that he and the other members of his staff who applied for level one licenses had to answer the same kinds of questions, and Akridge stated that the information sought from Hickmon was the same type of information routinely requested during the background investigation.

On February 5, 2004, Akridge interviewed Adele Street, who was Hickmon's former neighbor when he lived in O'Fallon, Missouri. Street told

Akridge that she knew Hickmon, his girlfriend Melissa Williams, and their children. Street said that Hickmon had been evicted because it was a Section 8 house and he was not supposed to be living there. Akridge interviewed Hickmon again on February 25, 2004, and asked him about the missing documents. In response, Hickmon gave Akridge a note stating:

> My name is Melissa Williams and you are asking another person to provide you information's [sic] pertaining to my residence. I will not provide Cleveland Hickmon with information's [sic] or document [sic] when his name is not on the lease. If you have any questions you need to contact me, and any information's [sic] that is needed my lawyer will review all documents.

The note was signed by Melissa Williams. Hickmon had lived with her since 2002, first in O'Fallon and then at Shepard Knoll street in St. Peters, Missouri. For the first time during the application process, Hickmon told Akridge he did not know the landlord because Williams pays the rent. Akridge's investigation revealed that both residences at which Hickmon and Williams resided were fully federally subsidized, and that the household was also receiving government food stamps. Because Hickmon's annual salary was over $59,000, Williams would not have been eligible for any federal subsidy for housing or food stamps if Hickmon's salary information had been properly disclosed. In light of this information, Akridge met with investigators for the United States Department of

Housing and Urban Development and the Internal Revenue Service to report suspected violations of federal law. After an ensuing investigation, Williams subsequently pled guilty in this Court to five counts of making false statements to federal agencies. In her plea colloquy, Williams admitted that she received Section 8 subsidized housing and food stamps while residing with Hickmon without reporting his income.

About the same time, Akridge learned from Strobbe that he fired Hickmon. Consequently, his Level One license application (which was still pending at the time of his termination) was never denied by the Gaming Commission.

In October 2003, while Hickmon was the Director of Security, the President Casino rented out the casino for a private birthday party for recording artist Nelly. The party took place on November 2, 2003. As a result of the event, the President Casino was charged with several violations of Missouri gaming laws and assessed a $50,000 penalty. The violations included allowing Nelly and eight other people to enter the casino without presenting a player's card, not enforcing the $500 loss-limit, failing to exercise minimum internal control standards, attempting to evade or defeat internal control regulations, and attempting to prevent the discovery of such violations. As Director of Security, Hickmon was held responsible for these violations, although he believes that other employees were actually responsible.

As a result of the violation of gaming regulations at the Nelly event, Strobbe fired Hickmon in March 2004.

On October 3, 2003, St. Charles County Circuit Court Judge Ted House issued an arrest warrant for Melissa Williams for the Class A misdemeanor offense of animal abuse. Three dogs lived in the house with Melissa Williams and Hickmon, including a dog named Revlon. Revlon belonged to Williams. When Bennett saw Williams' warrant and realized that Hickmon lived in the same house with her during the relevant time period, he reported it the Assistant Prosecuting Attorney for St. Charles County. The information was then provided to an animal control officer who worked with the prosecutor's office to seek a warrant for Hickmon on animal abuse charges for Revlon. On March 23, 2004, Judge House issued an arrest warrant for Hickmon for the Class A misdemeanor offense of animal abuse.

On April 6, 2004, Hickmon and Williams were arrested at their house by two deputies from the St. Charles County Sheriff's Department, Bennett and the federal agent from HUD who was investigating the case against Williams. The Sheriff's Department deputies were dispatched to the house in response to a call from the Highway Patrol that it wanted to serve the warrants. Pursuant to standard practice, the Sheriff's Department deputies called to confirm that the warrants

were still valid and active, and then met Bennett and the federal agent at Hickmon's house to serve the warrants. The deputies played no role in seeking the warrants, or in the subsequent interrogation and prosecution of Hickmon. Williams was convicted of the charge of animal abuse; Hickmon was not. The charges against Hickmon were dismissed because Williams pleaded guilty and the judge found no evidence that Hickmon was responsible for the care of the dog. Although Hickmon believes there was no valid arrest warrant for him on the date he was arrested, the undisputed evidence in the record demonstrates otherwise. Hickmon also believes that his arrest was racially motivated because he was not convicted of animal abuse and there were "too many" officers sent to arrest him.

## Discussion

Count I of Hickmon's amended complaint is a § 1983 due process claim against the Missouri Gaming Commissioners and Akridge. Hickmon claims that his due process rights were violated because he was harassed during his application process and denied a level one license. Hickmon does not indicate whether he is bringing a procedural or substantive due process claim, but both claims fail as a matter of law.

The Fourteenth Amendment guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." "An essential

principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing that is appropriate to the nature of the case." Stauch v. City of Columbia Heights, 212 F.3d 425, 430 (8th Cir. 2000). "The right to notice and opportunity to be heard must be granted at a meaningful time and in a meaningful manner." Id. (internal quotation marks omitted). To establish a substantive due process violation, Hickmon must show a violation of his fundamental constitutional rights and conduct that shocks the "contemporary conscience." Flowers v. City of Minneapolis, Minn., 478 F.3d 869, 873 (8th Cir. 2007) (internal citations omitted). In determining whether conduct meets this standard, courts look for "an abuse of power so brutal and offensive" that it fails to "comport with traditional ideas of fair play and decency." Hart v. City of Little Rock, 432 F.3d 801, 806 (8th Cir. 2006).

Although Hickmon alleges that he was denied a license without due process, this claim fails a matter of law because it is undisputed that he was never denied a license by the Missouri Gaming Commission. Instead, Hickmon was fired by the casino before his Level One application process was complete. Therefore, Hickmon has no claim that he was denied a property interest in a Level One license without due process.

Even if Hickmon could assert the deprivation of some other protectible

interest, he has not come forward with any evidence suggesting that he was not afforded due process in connection with the application process. Hickmon's opposition to summary judgment is replete with rhetoric but devoid of evidentiary support.[3] Instead of meeting his obligation under Rule 56 to "set forth specific facts sufficient to raise a genuine issue for trial," Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003), Hickmon merely rests on the vague allegations in his pleadings and claims that he will be able to elicit some supporting testimony for his claims at trial. Such an opposition is inadequate to demonstrate any disputed material facts warranting a trial of his due process claims.

The undisputed facts demonstrate that the licensing process in this case worked exactly as it was supposed to: Hickmon was issued a temporary license by the Missouri Gaming Commission and was allowed to perform his duties pending the completion of his application process. The information requested of Hickmon was the same information requested of all Level One licensing applicants, and the

---

[3]Hickmon's brief also contradicts his own testimony. For example, Hickmon's brief states that "Akridge did appear at plaintiff's residence acting [in] conjunction with the St. Charles Police in the unlawful search of plaintiff's residence which eventually resulted in plaintiff's unlawful arrest." [Doc. #55-2 at 10]. Yet, Hickmon testified in his deposition that Akridge was not present during that arrest. [Doc. #49-7 at 15]. Hickmon cannot contradict his own sworn testimony with an opposition brief filed by his attorney, and counsel is cautioned against making unsupported statements of "fact" that lack support in the record.

mere fact that it may have been more difficult for Hickmon to come up with the information (for example, information about his ex-wife) does not mean that his constitutional rights were violated merely because he was expected to provide it. Hickmon's background investigation was conducted by a member of the Missouri State Highway Patrol's Gaming Division (Akridge), the same as any other Level One licensing applicant. When Hickmon failed to provide all of the information requested in connection with his background investigation, he was given ample time and opportunity to obtain it, but he failed and refused to do so. During the investigation, Akridge discovered that Hickmon had provided incorrect answers to the questions about his criminal background and his financial condition. Hickmon also gave inconsistent and evasive answers about his living arrangements, the further investigation of which led to the prosecution of his girlfriend in this Court. Given the totality of circumstances and construing all inferences in Hickmon's favor, no rational finder of fact could conclude that the background investigation of Hickmon amounted to "an abuse of power so brutal and offensive" that it failed to "comport with traditional ideas of fair play and decency," Hart, 432 F.3d at 806, or that Hickmon was not afforded all the process due him. Hickmon's subjective beliefs that he should not have been required to provide the information requested are not evidence of due process violations. Judgment as a matter of law

will be entered in favor of the Missouri Gaming Commissioners and Akridge on Count I of the amended complaint.

Count II of the amended complaint is a claim for unlawful arrest against the Missouri Gaming Commissioners and the St. Charles County defendants. Hickmon argues that he was arrested on the animal abuse charges without a warrant, and that the defendants lacked probable cause to conduct a warrantless arrest. Because the undisputed evidence demonstrates that Hickmon was arrested pursuant to a valid warrant issued by Judge House, Count II fails as a matter of law.

Count III is a claim that the Missouri Gaming Commissioners conspired with the St. Charles County defendants under 42 U.S.C. § 1985 to deprive Hickmon of his civil rights under the Fourth and Fourteenth Amendments. To survive summary judgment on his § 1985 claim, Hickmon must "allege with sufficient particularity and demonstrate with specific material facts that the [defendants] reached some agreement and conspired together to deprive plaintiff of a federal right." Gometz v. Culwell, 850 F.2d 461, 464 (8th Cir. 1988) (internal quotation marks omitted). Hickmon's vague allegations of conspiracy permeate his complaint in this case. Hickmon attempts to impose liability upon the Missouri Gaming Commissioners for his arrest on animal abuse charges, claiming

that these defendants conspired together with the St. Charles County defendants to deprive him of his fourteenth amendment rights to be free from false arrest. However, as stated above Hickmon was not falsely arrested. Moreover, "bare allegations of certain statements by a defendant without any other proof of a conspiracy, are insufficient to sustain a conspiracy claim." Id. (internal quotation marks omitted).

Hickmon has presented no evidence that would permit a rational fact-finder to conclude that the Missouri Gaming Commissioners conspired with the St. Charles County defendants to deprive him of any constitutional rights. Hickmon's sole support for his assertion of conspiracy is that the Highway Patrol called to have the warrants executed, and the St. Charles County defendants were dispatched to assist them. Yet the only evidence in the record is that the St. Charles County deputies played no role in securing the warrants, and that it was standard procedure to involve the sheriff's department in the execution of warrants. It is similarly undisputed that the St. Charles deputies followed their normal practice of verifying the validity of the warrants before serving them.

Hickmon argues that the Missouri Gaming Commissioners were somehow "behind" his arrest because Akridge was present during the arrest. Hickmon theorizes that these defendants "must have" conspired together because otherwise

they would not have been present for his arrest. This argument is flawed because Hickmon admitted that Akridge was not present for his arrest. Bennett, who is a member of the Gaming Patrol and was assisting Akridge in his background investigation of Hickmon, was present for the execution of the warrants. Yet Bennett's participation in the execution of the warrants does not establish the existence of a disputed material fact sufficient to preclude summary judgment on this issue. The Court finds no evidence of a § 1985 conspiracy where the only facts reveal that a member of the Highway Patrol (even one assigned to the Gaming Patrol) serves valid arrest warrants with the assistance of the local sheriff's department pursuant to standard practices and policies. Hickmon's personal opinion that there were "too many officers" there to serve the warrants is not evidence of a conspiracy, and is insufficient to preclude summary judgment on this issue. Count III fails as a matter of law. Because Hickmon's § 1985 claim fails, his § 1986 claim[4] similarly fails. See Kaylor v. Fields, 661 F.2d 1177, 1184 (8th Cir. 1981) (holding that there can be no § 1986 liability without the existence of a valid § 1985 claim). For this reason, summary judgment in favor of defendants will be granted on Count IV of the amended complaint.

---

[4]That cause of action requires the defendants to know of the conspiracy and "having power to prevent or aid in preventing the commission of the same, neglect[] or refuse[] to do so . . . ." 42 U.S.C. § 1986.

Hickmon's final claim is for wrongful prosecution against the St. Charles County defendants and the Missouri Gaming Commissioners.  To succeed on a claim for malicious prosecution under Missouri law, Hickmon has the burden of proving that the defendants instigated the prosecution of the animal abuse charges against him, without probable cause and with malice, which was terminated in his favor and resulted in damages to him.  Linn v. Moffitt, 73 S.W.3d 629, 633 (Mo. Ct. App. 2002).  Even though Hickmon was not convicted of the underlying charges, he has come forward with no evidence to suggest that he was prosecuted maliciously and without probable cause.  To the contrary, all the evidence suggests that there was probable cause to issue the warrant since Hickmon actually resided at the house where the abused dog was found.  That the charges against Hickmon were eventually dismissed does not mean there was no probable cause to bring them.  Simply stating that evidence of this, and his other claims, may be developed at trial does not demonstrate a genuine dispute of material fact and cannot defeat summary judgment in favor of defendants on Count V of his amended complaint.

Accordingly,

**IT IS HEREBY ORDERED** that the defendants' motions for summary judgment [#45-1, #47, #49] are granted, and plaintiff's case is dismissed.

**IT IS FURTHER ORDERED** that defendant Akridge's alternative motion

to dismiss [#45] is denied as moot.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_/s/ Rodney W. Sippel_
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of November, 2007.